Filed 12/15/14  In re Deron C. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re DERON C., Jr., A Person Coming Under the Juvenile Court Law. | B254941 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK60412) |
| Plaintiff and Respondent, | |
| v. | |
| DERON C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra Losnick, Commissioner.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court has had jurisdiction over the minor child, Deron C. (Deron), for most of his eight-year-old life. During these years, the court repeatedly rejected the Department of Children and Family Services' recommendations that parental rights be terminated and Deron be placed in an adoptive home. Instead, the court gave Deron's biological parents more opportunities to reunify with him. Deron was a happy, normal baby and toddler in the initial stages of this case, and is now an extremely distressed child who has been moved among more than ten foster homes.

In this appeal, father (also known as Deron C.) challenges the court's denial of his Welfare and Institutions Code[1] section 388[2] petition seeking reinstatement of reunification services or the return of his son. Father was previously provided with 19 months of reunification services starting in 2006; however, during the subsequent seven years, the court sustained additional petitions against father and Michelle D. (mother), and denied father further reunification services. We affirm the juvenile court's February 25, 2014 denial of father's section 388 petition because he did not show "changed circumstances" and the requested relief was not in Deron's best interests.

### *FACTUAL AND PROCEDURAL BACKGROUND*

1.    *2006*

On July 25, 2006, father received a call from mother asking him to pick up Deron, who was then five months old, because mother had been arrested. Father had only seen Deron once before, but agreed to take care of him. On July 28, 2006, the Department of Children and Family Services (Department) filed a petition alleging that mother's abuse of illicit drugs rendered her incapable of providing regular care for Deron. The court detained Deron and released him to father.

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]    Section 388 provides, "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ."

In an August 2006 Jurisdiction/Disposition report, the Department stated that mother acknowledged using methamphetamines and cocaine "off and on" for years. Mother's sister told the Department that mother had been "in and out of rehabs for the past 22 years" and would do "well for awhile and [] even stay sober for 3-4 months at a time," but had always returned to using drugs. Mother had also been convicted of prostitution and disorderly conduct in 2005.

The Department reported that father had the following criminal history: (1) a 1988 felony conviction for robbery; (2) a 1991 conviction for the possession and purchase of cocaine base for sale; (3) a 1994 misdemeanor conviction for vehicle theft; (4) a 1996 felony conviction for possession of a narcotic controlled substance; (5) a 1996 conviction for possession of a narcotic controlled substance; (6) a 1998 felony conviction for possession and purchase of cocaine base for sale; (7) a 1998 felony conviction for transporting and selling narcotics and controlled substances; (8) a 2004 parole violation; and (9) a 2005 felony conviction for transporting, selling and possession of controlled substances. Father had most recently been released from prison in May 2006.

Father told the Department he understood its concern about his criminal record but he was now working full-time and providing for Deron. When father was told that Tina E. (maternal aunt) was interested in adopting the baby, he insisted that he could take care of Deron. The court thereafter sustained the petition and ordered that Deron remain released to father.

On October 13, 2006, the police responded to a report that father assaulted a woman, and arrested father who was found in possession of a "large amount" of cocaine. Father was charged with transporting and selling narcotics. Father asked a friend to take care of Deron until he was released from jail. On October 24, 2006, the Department removed Deron from the friend's house after finding the home conditions unsafe for an infant. Deron was placed with maternal aunt. When Deron arrived at maternal aunt's home, he was underweight, his movements were slow, he had fleas in his clothing and was "filthy," and he had open sores on his testicles. In addition, Deron

3

was "so congested that he could hardly breathe," threw up all nourishment, and only began to eat normally after several days.

On October 31, 2006, the Department filed a supplemental petition alleging that father's extensive criminal history and inability to provide adequate care to Deron due to father's incarceration placed the child at risk. On November 15, 2006, the court sustained the supplemental petition, and removed Deron from father's care. Father, who was still incarcerated, was provided with reunification services and ordered to participate in parenting classes, drug counseling and drug testing. The court ordered no reunification services for mother who, it was reported, had four other children, two of whom were dependents, and two others who were being raised by relatives. Deron remained released to maternal aunt who was in the process of adopting one of Deron's older siblings and who again stated her wish to adopt Deron.

2.    *2007*

At the six-month review hearing on June 11, 2007, the court found father was in compliance with the court-ordered case plan based on evidence he was enrolled in parenting and "drug education" classes in prison. Deron was "well cared for" in maternal aunt and uncle's home, and they were still hoping to adopt him. The court ordered that further reunification services be provided to father.

In June 2007, Deron visited his father in prison and did not "relate to or recognize" father. In August 2007, father was released from prison. In September 2007, the court ordered that father have visits no less than twice a week with Deron.

On November 7, 2007, the Department reported that father had consistent monitored visits with Deron, and that father was "appropriate" with Deron, but that Deron was "reluctant to interact with [father]" and was "very anxious" when separated from maternal aunt and uncle. During a November 29, 2007 visit, when father approached Deron, Deron began to cry. Deron then saw maternal uncle in the lobby area and yelled " 'Daddy, Daddy' " and clung to his leg. Maternal uncle told Deron to return to father, and Deron kicked and cried. The visit ended soon after.

4

The court held a 12-month review hearing on December 10, 2007. The Department recommended terminating reunification services and setting a hearing on the termination of parental rights "to establish a plan of adoption" for Deron. However, the court ordered further reunification services for father. The following day maternal aunt asked that Deron be removed from her home because she believed the court intended to return Deron to father and thought "[i]t is better we give up Deron now than later." Deron was now one year and ten months old. The Department placed Deron in a foster home, and that foster parent agreed to adopt Deron if he did not reunify with father.

3. *2008*

In a March 2008 Status Review Report, the Department reported that father had twice weekly visits with Deron. The social worker who monitored the visits said father was "easily frustrated by Deron's normal 2-year old behavior." Deron was "inconsistent with providing affection, engaging in play or initiating conversation with the birth father," but was still "eager to visit with his maternal relatives."

The Department further reported that father did not complete his drug education program, and that it had received a referral on March 9, 2008 alleging that father had hit his girlfriend and that he had been under the influence of alcohol while caring for Deron prior to Deron's placement in foster care. Father denied the allegations but acknowledged that he had a pending court date regarding the assault charge. The Department found the referral to be "substantiated."

The Department again recommended terminating father's reunification services as the visits between him and Deron "ha[d] not progressed to a more interactive, supportive nature," Deron "remain[ed] distant from [father] and [father] continue[d] to show lack of skills and understanding in dealing with toddler Deron." However, on April 29, 2008, the court extended reunification services for father, liberalized his visits, and ordered Deron to be returned to father on June 11, 2008.

On June 11, 2008, the Department reported that father was residing in a sober living facility that did not allow children. Father had been employed for three weeks at

5

a "temporary agency" and had not arranged for child care for Deron. The court continued the hearing until June 26, 2008. On June 26, 2008, the Department reported that father lived in a motel and planned to have Deron join him there. The court continued the hearing until July 3, 2008.

On July 3, 2008, the Department reported no change in father's residence. In addition, the Department reported that father had refused to provide information regarding the status of the recent assault charge against him, and had not "live-scanned"[3] as requested by the Department. The court released Deron to father over the Department's objection, and ordered the Department to provide him with family maintenance services. Three months later, father was incarcerated again after he violated parole.

When father was arrested on October 1, 2008, he asked Deron's daycare provider, Lee T., if she would care for Deron until father was released from jail, and she agreed. Father told Lee T. he would be released later that month. On November 20, 2008, the court ordered the Department to continue to provide father with family maintenance services.

4.    *2009*

In May 2009, the Department reported that Deron, who was now three years old, remained with Lee T. and her husband, and was doing well in their care. Lee T. stated that Deron is "in constant need of attention and has very insecure attachment issues." Lee T. and her husband "ha[d] been addressing his attachment issues with positive reinforcement and communication."

In June 2009, the Department received notice from the County that father had been sentenced to a ten-year prison term. The Department asked Lee T. if she would continue to care for Deron given that father had been incarcerated and was not providing any financial assistance to care for Deron. Lee T. said father had not "made

---

3    The Department uses the "live-scan" fingerprint system to obtain criminal background information.

much contact" with her and indicated that she could not continue to care for Deron without any financial assistance.

On August 11, 2009, the Department filed a supplemental petition alleging that father's incarceration and failure to make an appropriate plan for Deron placed Deron at risk of harm. The court detained Deron and he was placed with Lee T. and her husband. In September 2009, the Department reported that Deron liked living with "his mommy and daddy," referring to Lee T. and her husband, and wanted to stay with them. Lee T. said they were willing to care for Deron until father was able to "get him back."

In October 2009, the Department reported that they had located mother and she had recently given birth to a son. Mother was residing at a drug treatment center and said she would be able to care for Deron when she received permission from the center. The Department arranged for mother to visit Deron. Mother had not made any attempt to see Deron before this time.

On October 27, 2009, the court sustained the supplemental petition against father, removed Deron from father's custody, and denied him reunification services. Father was granted monthly monitored visits. The court ordered the Department to provide "permanent placement services" to Deron, and set a section 366.26[4] hearing on the termination of parental rights for February 23, 2010.

5.    *2010*

In January 2010, the Department reported that maternal aunt and uncle were still "very interested" in adopting Deron, however, "due to [] father's previous threats against the[ir] lives . . . they have requested that the child not have to have visits . . . . " The following month, maternal aunt said she was no longer interested in adoption because "father [had] threatened her." The Department recommended that the court terminate visits with father, but the court did not do so.

---

[4]    A section 366.26 hearing proceeds on the premise that the efforts to reunify are over, and the focus of the hearing is on the long-term plan for care and custody of the child.

7

On February 11, 2010, Deron was matched with a prospective adoptive family, however, when they learned more about Deron's history, they changed their mind about pursuing adoption because they "reside[d] in the same general area as his current foster caregivers and [were] concerned about []father's eventual knowledge of this upon release from prison, [] since he has a history of threatening caregivers."

On February 23, 2010, the court continued the section 366.26 hearing to April 27, 2010, to allow the Department to file a supplemental report. In April 2010, the Department reported that Deron was doing well with Lee T. and her husband, who wanted to become his legal guardians.

The court continued the section 366.26 hearing to June 22, 2010 "to address legal guardianship for Deron." In June 2010, the Department recommended that Deron be adopted. He was "highly adoptable" and the Department had identified 44 prospective adoptive homes for him. The Department noted that mother had recently begun visitation with Deron that year but argued that, based on her "25-year-old drug history" and Deron's lack of a "bond" with her, adoption was preferable. In June 2010, the court declined to terminate parental rights and instead appointed Lee T. and her husband as Deron's legal guardians. In October 2010, the court terminated jurisdiction over Deron. Deron was now four years old.

6.    *2011*

In August 2011, father filed a section 388 petition from prison asking that Deron, now five years old, be placed in another home because Lee T. was restricting father's contact with Deron and father believed Lee T. wanted to "keep" Deron. Father then withdrew the petition. The following month, mother filed a section 388 petition seeking reinstatement of reunification services or return of Deron to her custody on the grounds that she had bonded with Deron and could provide him with a "stable and safe environment."

In September 2011, the Department reported that Deron said he did not " 'want to see [father] or live with him' " because " 'he makes me nervous and upsets me,' " " '[father] scares me sometimes,' " " 'he calls my mommy bad names,' " and father had

told Deron " 'put that 'Bitch' back on the phone,' " referring to Lee T. Lee T. said that father also told Deron he was "stupid," and that she had stopped answering father's calls because of "what he was saying to Deron." Lee T. further reported that father had sent her "threatening text messages," and she planned to seek a restraining order against him when he was released from prison. The Department recommended that the court order no further contact between father and Deron, but the court did not do so.

In November 2011, the Department recommended that the court grant mother's petition as she had been working full-time for two years, was renting an apartment, and had developed a "loving relationship" with Deron. Later that month, the court granted mother's petition, returned Deron to her care, and ordered the Department to provide mother with family maintenance services.

7. *2012*

By September 2012, mother had relapsed into drug use again, and abandoned Deron and his brother with a relative, Stormie N. The Department filed the fourth petition in this case on September 21, 2012, alleging that mother's drug abuse and "fail[ure] to make an appropriate plan for the child's ongoing care and supervision" placed Deron at risk of harm. Deron, now six years old, and his brother, three years old, were detained and placed in foster care. The parents were ordered to have monitored visits and telephone calls.

In October 2012, the children's foster mother requested that they be moved. Deron was reported to be aggressive and have "anger issues," and both children showed developmental delays. The Department put the children in another foster home.

8. *2013*

In the Department's Jurisdiction/Disposition Report, it recommended that father not be provided with reunification services pursuant to section 361.5, subdivision (e)(1).[5] On January 23, 2013, the court sustained the petition and ordered

---

[5]     Section 361.5, subdivision (e)(1) creates an exception to the general rule that parents be provided with reunification services when a child is removed from their custody. It provides that "[i]f the parent or guardian is incarcerated . . . the court shall

Deron removed from his parents' custody. No reunification services were ordered for the parents, but father was allowed weekly phone calls with Deron and weekly monitored visits once he was released from prison. A section 366.26 hearing was set for May 22, 2013.

Father was released from prison in February 2013, and began attending monitored visits with Deron twice a week in March 2013. Father and Deron were "observed to be getting along well" during visits, however, unspecified "incidents" had been reported. Deron and his brother were moved to a new foster home on March 19, 2013.

On May 10, 2013, father filed a section 388 petition asking the court to return Deron to his custody or reinstate his reunification services with unmonitored visits. Father argued that there were changed circumstances because he had recently been released from prison and had a "close relationship" with Deron. The court summarily denied the petition on the grounds that father had been incarcerated for most of Deron's life.

In a section 366.26 Report, the Department noted that Deron and his brother had been moved to a new foster home, but this new foster parent had requested their removal due to Deron's behavior. Deron had "behavioral outburst" at school, suffered from "anger management issues," and displayed aggressive and hyper behavior. The Department was searching for an adoptive family for Deron and his brother, and reported that they were likely to be adopted. On May 22, 2013, the court continued the section 366.26 hearing to September 18, 2013 to allow the Department to provide proper notice to the parents.

In July 2013, the Department reported that Deron had been moved to a new foster placement again and was now living separate from his brother. Deron was aggressive toward other children and had told his foster mother he had "19 different names inside of him and they were taking control of him." Father had continued to visit

---

order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child."

10

Deron but was observed to be "aggressive, demanding, and impatient with Deron during their visits." Father also "talk[ed] badly about the foster home, telling Deron that the foster home doesn't care about him . . . ."

On September 18, 2013, the court continued the section 366.26 hearing to January 14, 2014, to allow the Department to file a supplemental report. Father filed another section 388 petition in November 2013 asking the court to return Deron to him or reinstate his reunification services. Father argued there were changed circumstances because he had been released from prison, was attending regular visits with Deron, was compliant with his probation, and lived at a sober living facility.

In December 2013, Deron's current foster mother requested that Deron be removed because of father's inappropriate behavior: father had repeatedly called in the middle of the night to speak to Deron and made "accusatory statements and threatening comments" to the foster mother. Deron was again moved to another foster care home.

9.      *2014*

In January 2014, Deron's foster mother expressed concern over father's visits with Deron: father was "abrupt with [Deron] and use[d] forceful language when interacting with him." The Department's social worker corroborated the foster mother's statements and described father's behavior as " 'emotionally abusive,' " and said that father had told Deron " 'you know [the foster mother] do[es]n't care about you . . . . ' " In addition, father was again repeatedly calling the foster mother at "inappropriate hours" requesting to speak to Deron. Both the social worker and the foster mother reported that father was "abrasive" in his interactions with Deron and, as a result, Deron would "shy away" from father during visits and sit with the caregiver or monitor. Deron was "visibly anxious" during one visit and "tried to avoid [father's] questioning" at one point when father "drill[ed] him on the importance of family."

Deron told the social worker he "like[d] spending time with his father" but appeared "very conflicted and d[id] not want to say anything negative toward [] father." When Deron was asked whether he wanted to live with father, he said "he would be good to stay with [father] because 'he [] lets me do whatever I want.' " However, the

11

Department found that, when given the choice between staying with father and his foster care placement, Deron "stated clearly that he would prefer to stay in his current placement." The Department continued to recommend that Deron be adopted and said it had located a prospective adoptive family for him and his brother.

On January 14, 2014, the court again continued the section 366.26 hearing to February 25, 2014, this time on its own motion, and asked the Department to file a supplemental report on "father's housing, how visits are going, and [to] address any changes in recommendation."

In February 2014, the Department reported that Deron had been placed in new foster homes twice in the past month, and his current caregiver had asked him to be removed from her home. Deron was now eight years old. The foster mother also reported that Deron had threatened to hurt himself and had then run into traffic. He had been hospitalized due to his injuries.

Father again continued to call the foster parents "throughout the night" to talk to Deron. In addition, one of Deron's caregivers said she was no longer able to care for Deron "due to the extreme stress caused to herself and her daughter through interactions with [father]." This caregiver further said she could no longer monitor father's visits with Deron "due to her feeling unsafe over statements made by [father]."

On February 25, 2014, the court again continued the section 366.26 hearing for yet another four months. The court also denied father's section 388 petition seeking reinstatement of reunification services or the return of his son on the grounds that father had not shown a change of circumstances and the requested relief was not in Deron's best interests. Father timely appealed the order denying the section 388 petition.

### CONTENTIONS

Father argues that the court erred in denying his request for reinstatement of reunification services because there were changed circumstances in that (1) he had been released from prison, and (2) he had consistently visited Deron for over a year. Father also argues that this relief was in Deron's best interests because father was the only "constant" person in Deron's life, Deron at one point indicated a desire to stay with

father, and reunification services would not be detrimental to Deron because Deron was not yet in an adoptive placement.

## DISCUSSION

The Legislature has provided for juvenile court jurisdiction over dependent children. (Section 300 et seq.) The primary goal of the dependency statutes is "to ensure the safety, protection, and well-being of children who are at risk of abuse, neglect, or exploitation, while preserving the family whenever possible." (*In re David M.* (2005) 134 Cal.App.4th 822, 824.) In dependency proceedings, there are generally four phases: (1) detention and jurisdiction; (2) disposition; (3) the provision of services for reunification or family maintenance, accompanied by periodic review hearings; and (4) either a permanent plan for the child's placement outside of the parent's home or termination of the dependency. (*In re Matthew C.* (1993) 6 Cal.4th 386, 391.) Once the juvenile court assumes dependency jurisdiction, it has broad authority to modify orders in the best interests of a dependent child. (Sections 385, 388; see also Cal. Rules of Court, rule 5.570.) This appeal involves a challenge to the denial of a section 388 petition made after the court had terminated reunification services and set a hearing on the termination of parental rights.

1.     *Section 388*

"A section 388 petition must show a change of circumstances and that modification of the prior order would be in the best interests of the minor child. [Citations.] To support a section 388 petition, the change in circumstances must be substantial. [Citation.]" (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) We review the juvenile court's decision on a section 388 petition for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

13

The factors to be considered in evaluating the child's best interests under section 388 are: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.) However, these factors are not exhaustive, and the focus, once reunification services have been terminated, is on the child's need for permanency and stability. (See *In re J.C.* (2014) 226 Cal.App.4th 503, 527-528.)

2. *The Court Did Not Err In Denying Father's Section 388 Petition*

a. *Father Did Not Show Changed Circumstances*

Father contends that the juvenile court denied him reunification services in January 2013 because father was incarcerated at the time and unable to visit Deron. Accordingly, father argues that the court should not have denied his request to reinstate services in February 2014 because he was no longer incarcerated and had consistently visited Deron for a year.

In January 2013, the juvenile court denied reunification services to father pursuant to the Department's recommendation under section 361.5, subdivision (e)(1). Section 361.5, subdivision (e)(1), creates an exception to the general rule that parents receive reunification services when a child is removed from their custody, and provides that "[i]f the parent or guardian is incarcerated . . . the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child." Accordingly, the court denied father reunification services in January 2013 because it made the implied finding that it would be detrimental to Deron should father be provided with such services. To show changed circumstances warranting a change in that order, father was required to show that it would no longer be detrimental to Deron if father were provided with further reunification services. Father did not do so.

14

It is clear from the record that father was entrenched in a criminal lifestyle that led to multiple incarcerations during Deron's lifetime and father repeatedly failed to make an adequate plan for the child's care and supervision during those incarcerations. For example, in 2006, when Deron was an infant, father left him with a friend and Deron was soon after removed from that home suffering from health conditions due to the inadequate care he had received. In addition, in 2008, father left Deron with a day care provider who had agreed to temporarily care for Deron while father was in jail. Father was then sentenced to ten years in prison, and Deron was removed from his care because the day care provider could not continue to care for Deron without any financial support from father.

Furthermore, that father was released from prison did not show that he had remedied other behaviors which threatened Deron's well-being. Starting in 2010, if not earlier, father repeatedly made threats against Deron's caregivers and prospective adoptive parents that led those individuals to fear for their safety and to discontinue providing care for Deron or withdraw their requests for adoption. These threats, as well as father's harassing phone calls to Deron's caregivers, caused Deron to be removed from multiple foster homes and thwarted Deron's chances for adoption with at least two families. At the time of the hearing on father's section 388 petition, there was no evidence father had changed such behavior or that he would no longer engage in such violent threats and harassment.

Lastly, that father had attended consistent visits with Deron for the past year was also insufficient to show that it would no longer be detrimental to Deron if father were given another chance at reunification. Father's behavior during those visits was often observed to be inappropriate; he was described as " 'emotionally abusive' " and "aggressive, demanding, and impatient with Deron during their visits." This evidence did not show that a substantial change of circumstances had occurred as required under section 388.

b.      *The Requested Relief Was Not In Deron's Best Interests*

"Childhood does not wait for the parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)  The Supreme Court made this statement in the context of discussing the time limits the Legislature has placed on dependency proceedings:  "It must be remembered that up until the time that the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency.  This could be for a period as long as 18 months.  Another four months may pass before the section 366.26 hearing is held.  While this may not seem a long period of time to an adult, it can be a lifetime to a young child." (*Ibid.*)

Here, in contrast to the timeline envisioned by the Supreme Court, the juvenile court first asserted jurisdiction over Deron over eight years ago and has maintained jurisdiction over Deron for most of this time.  The section 366.26 hearing that was originally set for May 2013, after the fourth petition had been sustained in this case, was continued for 13 months.  We take judicial notice that, during the pendency of this appeal, the juvenile court has continued the section 366.26 for yet another six months. This delay is unacceptable; permanency is long overdue for Deron.  His tragic decline from a normal, happy child to an extremely distressed eight-year-old illustrates the Supreme Court's maxim that " '[t]here is little that can be as detrimental to a child's sound development as uncertainty over whether [he] is to remain in [his] current "home," . . . especially when such uncertainty is prolonged.' " (*In re Sade C.* (1996) 13 Cal.4th 952, 988.)

Father argues that reinstating his reunification services would not further delay permanency for Deron because Deron is not yet in an adoptive home.  Father also argues that Deron had been "rejected by all the adults in his life" and father was the "only constant person in Deron's life."  These arguments are without merit.  Reinstating father's reunification services would derail the Department's current ongoing efforts to place Deron in an adoptive home.  In addition, father was not a source of stability for Deron.  On the contrary, father had again and again made violent threats against Deron's caregivers and prospective adoptive parents, thwarting those individuals'

16

efforts to provide Deron with a stable home. Further, father has for decades engaged in an unstable, criminal lifestyle that led to repeated incarcerations during which he was unable to provide for Deron's care.

The record in this case shows that father is a dangerous and violent man: he assaulted two women, and threatened the lives of maternal aunt and uncle, Lee T. and her husband, and other caregivers. Furthermore, there was evidence that, over the past eight years, father was consistently emotionally abusive or inappropriate with Deron during visits and phone calls. Although Deron, at one point, said he wanted to live with father, because " '[father] lets [him] do whatever [he] want[s],' " when given the choice between staying with father and his foster care placement, Deron "stated clearly that he would prefer to stay in his current placement."

"The parent's interest in having an opportunity to reunify with the child is balanced against the child's need for a stable, permanent home. The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority." (*In re Marilyn H., supra,* 5 Cal.4th at p. 309.) In the end, "there must be a limitation on the length of time a child has to wait for a parent to become adequate" to the task of parenting. (*Id.* at p. 308.) Here, father was given the opportunity to reunify with Deron and was unsuccessful. Deron's interest in permanency and stability should have been given priority by the court years ago. Put another way, Deron's need for permanency and stability trumps father's interest in reunifying with Deron. Quite simply, father did not show that Deron's best interest would be served by giving father yet another chance to reunify with him.

## DISPOSITION

The order is affirmed. We urge the trial court to expeditiously proceed with the section 366.26 hearing, and to give "substantial weight to [the] minor's need for prompt resolution of his [] custody status, the need to provide [him] with [a] stable environment[], and the damage to [the] minor of prolonged temporary placements." (Section 352, subd. (a).) No continuances shall be granted that are "contrary to the interest[s] of the minor" as set forth above. (*Ibid.*)

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

LAVIN, J.*

WE CONCUR:

KITCHING, Acting P. J.

ALDRICH, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.